1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                    FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11   WADE ROBERTSON,                    )   No. C 10-05027 EJD (PR)
                                        )
12              Petitioner,             )   **ORDER DENYING PETITION FOR**
                                        )   **WRIT OF HABEAS CORPUS;**
13         vs.                          )   **GRANTING LIMITED**
                                        )   **CERTIFICATE OF**
14                                      )   **APPEALABILITY**
     ATTORNEY GENERAL KAMALA            )
15   HARRIS,                            )
                                        )
16              Respondent.             )
                                        )
17   _____   )
                                        )
18

19         Petitioner has filed a petition for a writ of habeas corpus under 28 U.S.C.

20   § 2254 challenging his state conviction from Santa Clara Superior Court.  The Court

21   ordered Respondent[1] to show cause why the writ should not be granted.  Respondent

22   _____

23         [1]Petitioner originally named Judge Rise Jones Pichon as respondent.
     However, the rules governing relief under 28 U.S.C. § 2254 require a person in
     custody pursuant to the judgment of a state court to name the "'state officer having
24   custody'" of him as the respondent.  Ortiz–Sandoval v. Gomez, 81 F.3d 891, 894
     (9th Cir. 1996) (quoting Rule 2(a) of the Rules Governing Habeas Corpus Cases
25   Under Section § 2254).  This person typically is the warden of the facility in which
     the petitioner is incarcerated.  Stanley v. Cal. Supreme Court, 21 F.3d 359, 360 (9th
26   Cir. 1994).  Here, however, petitioner was not incarcerated when he filed the
     petition.  He was on probation, but probably no longer is, meaning that his probation
27   officer probably would not be a proper respondent.  That he is not incarcerated or on
     probation does not moot the petition, see Spencer v. Kemna, 523 U.S. 1, 8–12
28   (1998) (courts may presume that a criminal conviction has continuing collateral

has filed an answer and a memorandum of points and authorities, and has lodged exhibits with the court. Petitioner has responded with a traverse. For the reasons set forth below, the Petition for a Writ of Habeas Corpus is **DENIED**.

## PROCEDURAL BACKGROUND

On May 5, 2008, Petitioner was found guilty by a jury of misdemeanor driving under the influence of alcohol (Cal. Veh. Code § 23152(a)) and misdemeanor possession of a billy (Cal. Penal Code §12020(a)(1)). The jury also found true an allegation that Petitioner had wilfully refused a peace officer's request to submit to a chemical test (Cal. Veh. Code §§ 23577(a), 23157, 23612). (Docket No. 9, Ex. 1 ("CT") at 31–32 and 897–901.) On October 30, 2008, the court suspended imposition of sentence and placed Petitioner on probation for three years with conditions including a 12-day jail term. (CT at 1232.)

On September 28, 2009, the Appellate Division of the Santa Clara County Superior Court affirmed the judgment in a summary two-page order. (Docket No. 9, Ex. 7.) On October 20, 2009, the Appellate Division of the Santa Clara County Superior Court denied Petitioner's application for certification to the California Court of Appeal. (Id., Exs. 8 and 9.) Petitioner petitioned the Sixth District Court of Appeal to transfer the case to the California Court of Appeal, which was denied on November 13, 2009. (Id., Exs. 10 and 11.) On November 20, 2009, Petitioner filed a writ of habeas corpus in the California Supreme Court, which was denied on January 13, 2010 in a summary denial. (Id., Exs. 12 and 13.)

Petitioner filed the instant federal habeas petition on November 5, 2010.

_____

consequences sufficient to avoid mootness), but it does mean that there is no warden, jailer, or probation officer who would be a proper respondent. The Court therefore has substituted Kamala Harris, the Attorney General, as respondent. See Silveyra v. Moschorak, 989 F.2d 1012, 1015 n. 3 (9th Cir. 1993) (court may substitute proper respondent sua sponte), superseded by statute on other grounds by Campos v. I.N.S., 62 F.3d 311 (9th Cir. 1995); see also Rule 2(b), Rules Governing Habeas Corpus Cases Under Section § 2254, 1975 advisory committee's note (when petitioner is not incarcerated or on probation or parole, proper respondent is the Attorney General).

//

# FACTUAL BACKGROUND

<u>Prosecution Case</u>

On the night of April 27, 2006, Petitioner was with his friend Tim Gray, in Gray's office which was located upstairs from Nola's restaurant, located at 535 Ramona Street, Palo Alto. (Jury Trial Reporter's Transcript ("RT")[2] at 243.) Petitioner and Mr. Gray appeared to be celebrating a case that they had won. (RT at 353.) Around 8:36 p.m., Petitioner opened a check at Nola's. Over the next four hours, 24 shots of Patron tequila, three Red Bull and vodkas, two Gray Goose and juices, one pink Pantie Dropper cocktail, one soda water, one Red Bull, one cup of crab soup and a bowl of gumbo were ordered and added to Petitioner's check. (RT at 272–75.) Tiffany Colon, a cocktail waitress at Nola's, delivered the drinks to the office. At trial she testified that there were five people total in the office, including Petitioner. (RT at 228.) To her personal knowledge, all five people were drinking. (RT at 228.) Any drinks delivered by Colon which were paid for in cash did not show up on Petitioner's check. (RT at 275.)

At the end of the night, around 12:45 a.m. on April 28, 2006, Shiraz Qadri, Nola's general manager, spoke with Petitioner. (RT at 252.) Petitioner was upset because he believed that change had not been returned to him. (RT at 253–54 and 257–58.) Qadri had been under the impression that the money had been intended as a gratuity, but agreed to reduce Petitioner's bill. (RT at 257–58.) Qadri testified that Petitioner was drunk at the time of their conversation, citing Petitioner's dilated eyes, red face, and red eyes; Petitioner's aggressive behavior; Petitioner's verbosity and outlandish claims; and the smell of alcohol on Petitioner's breath. (RT at 257–58.) Qadri testified that he had seen drunk people previously and that Petitioner's behavior corresponded with how he had seen drunk people behave. (RT

---

[2]The Reporter's Transcript for the jury trial is located at Docket No. 9, Ex. 2, Volumes 5–12. The citations refer to the pagination assigned by the court reporter.

United States District Court

For the Northern District of California

at 258–59.)  Qadri offered to call Petitioner a cab, but Petitioner declined and left. (RT at 259.)  When Qadri walked outside Nola's, he saw Petitioner down the street standing in front of a white pickup with the passenger door open.  (RT at 260–61.)

Qadri flagged down Palo Alto Police Agent Ryan, who was driving by in his patrol car on DUI patrol.  (RT at 102 and 337.)  Qadri pointed out Petitioner to Agent Ryan, stating that Petitioner was pretty drunk and had promised to take a cab. (RT at 337.)  Petitioner noted Agent Ryan's presence and called out to the two people to look out, there was a cop.  (RT at 106.)

Approximately ten to fifteen minutes later, Agent Ryan pulled Petitioner over as they were both driving westbound on Lytton Avenue in Palo Alto.  (RT at 104.) Petitioner pulled into a Shell station at the corner of Lytton and Alma, immediately jumped out of his truck, walked back to Agent Ryan's patrol car, and aggressively asked why he had been stopped.  (RT at 104, 107, and 110–11.)  Agent Ryan noticed the smell of alcohol on Petitioner's breath and asked Petitioner if he had consumed any alcohol.  (RT at 111.)  Petitioner denied consuming any alcohol and stated that he was the designated driver.  (RT at 111–12.)

Agent Ryan then had Petitioner perform four field sobriety tests.  (RT at 112.) At this time, police officers David Guy and Cole Ghilarducci were also present.  (RT at 112.)  Prior to performing the tests, Petitioner informed Agent Ryan that he had a bad knee from a college sports injury.  (RT at 118.)

The first field sobriety test conducted was the nystagmus gaze test.  Petitioner was asked to stand still and focus on Agent Ryan's finger as it moved back and forth in a straight line at a 15-inch distance from Petitioner's face.  (RT at 114.)  In conducting the test, Agent Ryan noticed the phenomenon of nystagmus present in both of Petitioner's eyes in that the irises of Petitioner's eyes did not smoothly follow the finger, but had a jerky or skipping movement as they moved left to right. (RT at 115.)  In 98 percent of the population, nystagmus usually indicates the presence of alcohol.  (RT at 116.)

United States District Court

For the Northern District of California

1  The second field sobriety test conducted was the Romberg test, where

2  Petitioner was asked to tilt his head back, close his eyes, and estimate when 30

3  seconds had passed.  (RT at 120.)  Petitioner was instructed to put down his head,

4  open his eyes and tell Agent Ryan to stop timing when he believed 30 seconds had

5  passed.  (RT at 120.)  Petitioner opened his eyes after ten seconds but did not put his

6  head down.  (RT at 123.)  His body swayed about two inches in all directions.  (RT

7  at 122.)  Agent Ryan timed 78 seconds before Petitioner put his head down and

8  opened his eyes.  (RT at 121.)  Petitioner never told Agent Ryan to stop timing.  (RT

9  at 121.)

10  The third field sobriety test was the one-leg balance test, where Petitioner was

11  asked to lift one leg about six to eight inches off the ground, point his toe towards

12  the ground, and count from 1,001 to 1,020 as follows: 1,001, 1,002, 1,003, up to

13  1,020.  (RT at 124.)  Petitioner attempted this test three times, but each time lost his

14  balance and touched his foot down after two seconds.  (RT at 125.)

15  The fourth field sobriety test was the line test, where Petitioner was asked to

16  walk straight along a line with his hands at his sides counting aloud.  (RT at 127.)

17  Petitioner was asked to walk heel to toe ten steps in one direction, then turn around,

18  and walk seven steps back.  (RT at 127.)  Petitioner took the right number of steps in

19  each direction but never touched heel to toe.  (RT at 128.)  Petitioner had been asked

20  to keep his hands parallel to his sides, but instead he held his arms out at a 45 degree

21  angle for the initial ten steps, and then for the return seven steps, held his upper arms

22  straight out from his shoulders with his lower arms dangling down at the elbow at a

23  right angle.  (RT at 128–29.)  With each step, Petitioner bounced rhythmically up

24  and down.  (RT at 129.)  In the middle of the line test, Petitioner bent down to

25  remove his sandals and almost fell on his face.  (RT at 129–30.)

26  During the tests, Petitioner had poor coordination and terrible balance.  (RT

27  at 133.)  Petitioner was also loud and argumentative about each test.  (RT at 132.)

28  He called Agent Ryan a liar before Agent Ryan explained what he was trying to do,

1    and disputed everything Agent Ryan said.  (RT at 132–33.)

2        In Agent Ryan's expert opinion, based upon the field sobriety tests and

3    Petitioner's demeanor, Plaintiff was clearly under the influence and had been driving

4    under the influence.  (RT at 132.)

5        Officer Guy also testified that Petitioner did not successfully complete any of

6    the field sobriety tests.  (RT at 286–88.)  Officer Guy smelled alcohol on Petitioner's

7    breath.  (RT at 288.)  He also testified that Petitioner's behavior was typical of

8    someone who was intoxicated, citing Petitioner's voice ranging in volume from low

9    to normal to loud; Petitioner's inability to follow directions; and Petitioner's

10   repeated questions and requests to repeat things.  (RT at 288.)  In Officer Guy's

11   expert opinion, Petitioner was clearly intoxicated.  (RT at 288.)

12       Officer Guy found a baton in plain view in Petitioner's car, located on the

13   bench seating between the seatbelts for the driver and the passenger.  (RT at 289.)

14       Agent Ryan arrested Petitioner and took him to the prebooking area in the

15   police department.  (RT at 133.)  Petitioner refused to take any chemical test,

16   including a breath test or a blood test.  (RT at 132.)  Agent Ryan provided Petitioner

17   with DMV Form DS 367 which advises that a person who is lawfully arrested is

18   required by law to submit to a chemical test and advises that there is no right to

19   speak to an attorney in relation to Form DS 367.  (RT at 135–37.)  Despite reading

20   the form, Petitioner repeatedly claimed that he had a right to speak with an attorney

21   and requested an attorney.  (RT at 136–37.)  Agent Ryan again advised him that

22   there was no right to speak with an attorney prior to complying with Form DS 367,

23   and that Petitioner's refusal to submit to a chemical test could be used against him in

24   court.  (RT at 138.)  Agent Ryan further advised Plaintiff that a refusal to submit to a

25   chemical test would result in either suspension of Petitioner's driving privileges for

26   one year or revocation of his driving privileges for two or three years.  (RT at 138.)

27   In addition, if Petitioner was convicted of driving under the influence with a blood

28   alcohol level of .08 or more, the refusal to submit to a chemical test would result in a

United States District Court
For the Northern District of California

fine or mandatory imprisonment.  (RT at 138.)  Petitioner still refused to take either a blood test or a breath test.  (RT at 139.)

Agent Ryan read Petitioner his *Miranda* rights while Petitioner was at booking.  (RT at 139–40.)  Petitioner agreed to speak with Agent Ryan after being read his *Miranda* rights.  (RT at 132.)  At this point, Agent Ryan asked Petitioner if the collapsible baton found in his car belonged to him.  (RT at 141.)  Petitioner responded that the baton belonged in the car and asked if it was a misdemeanor under California law to possess the baton.  (RT at 141–42.)  The baton found in Petitioner's truck is similar to the ones that are issued to the Palo Alto Police Department.  (RT at 142.)

Petitioner was in the booking area for approximately an hour and a half, during which he was videotaped.  (RT at 143.)  Petitioner was argumentative virtually the entire time.  (RT at 132.)  He threatened to have Agent Ryan fired and to sue Agent Ryan.  (RT at 208.)  While Petitioner was in the booking area, Agent Ryan conducted a second series of field sobriety tests, which Petitioner again failed.  (RT at 143.)  Nystagmus was still present in Petitioner's eyes to the same degree.  (RT at 147.)  On the Romberg test, Petitioner held his arms tightly to his sides and estimated 51 seconds to be 30 seconds.  (RT at 144.)  Petitioner tried the balance test twice.  On his first attempt, he lost his balance after 7 or 8 seconds and used his arms at his sides to balance.  (RT at 145.)  On his second attempt, he kept his balance for 30 seconds, but kept his heel only four inches off the ground, rather than six to eight inches, and he bounced a little at the end.  (RT at 145.)  For the line test, for the Petitioner missed touching heel to toe four times and tripped off the line on the third step.  (RT at 147.)  On the seven steps back, Petitioner missed touching heel to toe on any of the steps.  (RT at 147.)  In Agent Ryan's opinion, Petitioner was still under the influence of alcohol.  (RT at 147.)

Alice King, a forensic toxicologist for the Santa Clara County Crime Laboratory, testified that typical symptoms of hypoglycemia are a feeling of hunger;

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1    difficulty breathing; perspiration; feeling light-headed; feeling faint; and becoming

2    confused.  (RT at 331.)  Someone suffering from hypoglycemia is generally weak

3    and fatigued.  (RT at 331.)   Hypoglycemia only causes a fruity smell if the

4    individual is also diabetic.  (RT at 331–32.)

5            Defense Case

6            Petitioner played the entire DVD of the booking process during his opening

7    statement and it was introduced into evidence.  (RT at 93–95 and 348.)  The video

8    did not include sound.  (RT at 160.)

9            Amanda Grillo testified for the defense.  Grillo worked as a waitress at

10   Nola's on the night of April 27, 2006.  (RT at 353.)  She saw Petitioner that night

11   upstairs in Gray's office and downstairs in the bar area with a bunch of people.  (RT

12   at 353.)  She did not see Petitioner consume any alcohol.  (RT at 354.)  Grillo

13   finished working around 10:43 pm that night.  (RT at 360 and 439.)  Her usual

14   practice was to leave Nola's immediately after she finished her shift.  (RT at 360.)

15   Grillo testified that Petitioner "was in no way intoxicated at all" and that she never

16   told Agent Ryan that Petitioner was intoxicated.  (RT at 355.)

17          On cross-examination, Grillo acknowledged that she had been unaware of

18   Petitioner's DUI arrest until she received a subpoena from Agent Ryan in mid-2007.

19   (RT at 358.)  Grillo agreed that she had not thought about the night of April 27,

20   2006, until she received the subpoena.  (RT at 365.)  She stated that "[i]t was just a

21   regular night.  There was no reason to remember."  (RT at 365.)  She agreed that she

22   did not know if Petitioner was drinking the night of April 27, 2006 or on the

23   morning of April 28th, 2006.  (RT at 364.)  Grillo stated that she met with Petitioner

24   soon after receiving the subpoena.  (RT at 358–59.)  In September 2007, Grillo

25   signed a declaration that Petitioner had prepared for her.  (RT at 360–61.)  She stated

26   that she had read the entire declaration and it was consistent with what she

27   remembered.  (RT at 360.)  Grillo also acknowledged that she was employed by

28   Gray for awhile.  (RT at 363–64.)

On cross-examination, Colon stated that she never saw Petitioner drinking alcohol and that she did not know if Petitioner was intoxicated.  (RT at 235.)  Colon acknowledged that Agent Ryan interviewed her on September 6, 2007, but disputed Agent Ryan's police report regarding that interview.  (RT at 236–37.)  She stated that she never told Agent Ryan that Petitioner had been fairly intoxicated when she last saw him that evening.  (RT at 239.)  She stated that when Agent Ryan's report was read to her for her review and approval, she was not informed that the sentence "Colon had been fairly intoxicated when she last saw [Petitioner] that evening" was in the report.  (RT at 238–39.)  On redirect, Colon acknowledged that the police report had been presented to her the week before trial, and, at that time, she had confirmed that the police report was pretty much accurate.  (RT at 243–44.)

On cross-examination, Qadri acknowledged that did not personally see Petitioner consume any alcohol drinks.  (RT at 279.)

A field sobriety test expert, Robert LaPier, testified that after watching the video of Petitioner conducting the sobriety tests in the booking area, he concluded that Petitioner was not impaired.  (RT at 379.)  LaPier testified that Petitioner's performance on the Romberg test could be attributed to being a slow counter and to his Southern drawl, rather than to intoxication.  (RT at 384–85.)  LaPier also testified that Agent Ryan administered the line test incorrectly because there are supposed to be nine steps down the line, and nine steps back, and administered the nystagmus test incorrectly because the test requires seven passes back and forth across the eyes.  (RT at 390 and 394–95.)  LaPier stated that if a test was administered according to standardized instructions, the results could not be trusted.  (RT at 388.)  LaPier stated that Petitioner's actions during the video, outside of the sobriety tests, did not show any signs of intoxication.  (RT at 379–81 and 400–01.)

On cross-examination, LaPier agreed that Petitioner's fall, during the line test, off the line at step three had nothing to do with the number of steps he was supposed to take, that failing to touch heel to toe demonstrated a failure to follow

United States District Court

For the Northern District of California

1   instructions, and that holding his arms out showed a failure to follow instructions

2   and a problem with balance.  (RT at 402–05.)  LaPier agreed that a problem with

3   balance and a failure to follow instructions could be caused by being under the

4   influence of alcohol as well as other causes.  (RT at 403–04.)  In determining

5   whether a person is under the influence of alcohol, LaPier would take note of a

6   person putting down his leg after two seconds each of the three times he attempted

7   the balance test; of a person estimating 78 or 51 seconds as 30 seconds during the

8   Romberg test; and of the smell of alcohol on a person's breath. (RT at 405–06 and

9   416–17.)   He would also take note of a person's refusal to take a breath test and find

10   it suspicious.  (RT at 428.)

11          Donald Criswell, a licensed private investigator, who had formerly worked a

12   as a police officer for the San Jose Police Department, testified that the baton found

13   in Petitioner's car could have non-violent uses, such as checking for tire pressure

14   and using as a jack handle.  (RT at 431–33.)

15          Petitioner told Agent Ryan that he had hypoglycemia.  (RT at 189.)

16   Hypoglycemia can create the overtone odor of an alcoholic beverage, and can create

17   physical impairments that mimic DUI.  (RT at 190.)  Petitioner told Agent Ryan that

18   he had not consumed alcohol that evening.  (RT at 190.)

19          <u>Suppression Hearing</u>

20          Petitioner filed a pre-trial suppression motion, seeking to suppress evidence

21   obtained from the vehicle stop on the grounds that he was illegally detained and

22   arrested.  (CT at 40–42.)

23          *Prosecution Case.*  At the hearing on the suppression motion, Agent Ryan

24   testified that on April 28, 2006, at around 1:00 a.m., he was driving southbound on

25   Ramona Street just before the intersection of Ramona Street and Lytton Avenue,

26   when he recognized Petitioner's truck headed in the opposite direction.  (2/26/2007

27

28

RT[3] at 22.)  He made a U-turn to get behind Petitioner's truck.  (2/26/2007 RT at 22.)  Agent Ryan saw Petitioner stop at the flashing red light for Lytton.  (2/26/2007 RT at 7.)  Petitioner then made a left turn to go westbound onto Lytton, cutting off an eastbound vehicle on Lytton and forcing that vehicle to stop.  (2/26/2007 at 7.)  Upon observing a California vehicle code violation for failing to yield to traffic at a stop sign, Agent Ryan made a left turn onto Lytton and initiated a traffic stop at a gas station at the corner of Lytton and Alma.  (2/26/2007 at 8.)

        William Krone, a forensics video analysis expert, analyzed several rolls of bank film taken by security cameras at the bank at the corner of Ramona and Lytton.  (2/26/2007 RT at 23–26.)  Generally, each camera took a picture every 28 to 30 seconds.  (2/26/2007 RT at 26.)  However, the cameras had a motion sensing device which triggered multiple frames in certain situations.  (2/26/2007 RT at 27.)  Krone found nine significant photos from around 1:00 a.m. on April 28, 2006.  (2/26/2007 RT at 28.)  None of these photos showed Agent Ryan's patrol car stopped behind Petitioner's truck.  (2/26/2007 RT at 23–26.)  Based on Krone's measurements, if Agent Ryan's car had been stopped behind Petitioner's truck northbound on Ramona at Lytton, the camera would have its image.  (2/26/2007 RT at 36.)  Based upon these photos and after measuring potential speeds of vehicles and the distance between cars at safe speeds, Krone concluded that it was impossible that Agent Ryan's car could have been stopped behind Petitioner's truck when Petitioner was stopped northbound on Ramona at Lytton around 1:00 a.m.  (2/26/2007 RT at 40 and 3/6/2007 RT at 34–43.)

        Robert Lindskog, a registered engineer, reviewed the size of the vehicles, the dimensions of the scene, and the photos which did not show two vehicles stopped

---

[3]The Court heard the suppression motion on February 26 and March 6, 2007. The reporter's transcript for the February 26, 2007 hearing is located at Docket No. 9, Ex. 2, Vol. 1 and referred to as "2/26/2007 RT."  The reporter's transcript for the March 6, 2007 hearing is located at Docket No. 9, Ex. 2, Vol. 2 and referred to as "3/6/2007 RT."

United States District Court
For the Northern District of California

1   behind one another.  (2/26/2007 RT at 56–59.)  He testified that at least the rear half

2   of the patrol car would have been in one of the photos if Agent Ryan had stopped

3   behind Petitioner's truck.  (2/26/2007 RT at 58.)

4       Petitioner also presented the testimony of two eyewitnesses who testified that,

5   contrary to Agent Ryan's testimony, Agent Ryan's police car was not immediately

6   behind Petitioner's truck and did not stop behind Petitioner's truck.

7       Raymond Connolly testified as follows: Connolly was with Petitioner at

8   Nola's the night of April 27, 2006, and he was not drinking alcohol that night.

9   (2/26/2007 RT at 61, 68.)  At about 12:55 a.m., Petitioner pulled by his car and

10  beeped his horn at him.  (2/26/2007 RT at 67.)  Petitioner pulled up to the light at

11  Lytton, waited 10 to 15 seconds, and then made a left turn with no traffic around.

12  (2/26/2007 RT at 65.)  A minute or two later, Connolly saw a police car follow

13  Petitioner's trick.  (2/26/2007 RT at 65–66 and 69–70.)

14      Jerry Webb testified as follows: Around 12:55 a.m. on April 28, 2006, he was

15  near the intersection of Ramona and Lytton, smoking a cigarette (2/26/2007 RT at

16  74.)  He heard a horn honk and looked towards the sound.  (2/26/2007 RT at 76.)

17  He immediately recognized Petitioner's truck and saw it pull up to the intersection

18  of Ramona and Lytton.  (2/26/2007 RT at 76.)  Petitioner stopped about fifteen feet

19  from the intersection and remained there for about ten seconds before he made a left

20  on Lytton.  (2/26/2007 RT at 77.)  About a minute later, a police car came through

21  the intersection in a hurried manner, made the same left turn, and pulled over a block

22  behind Petitioner's vehicle.  (2/26/2007 RT at 77.)

23      On rebuttal, Agent Ryan testified that he drove by the ATM camera several

24  times that night.  He reviewed the photos rolls and found that the camera did not

25  capture each time he drove by the camera.  (3/6/2007 RT at 21.)  He found six

26  photos of a patrol car.  (3/6/2007 at 8.)  The image at 12:56:35 a.m. shows his car

27  going northbound on Lytton.  (3/6/2007 at 10.)  He then made a u-turn and turned

28  and parked southbound in front of the ATM camera.  (3/6/2007 at 10.)  The nose of

1    his car is in the photos from 12:57:06 a.m. to 12:58:44 a.m.  (3/6/2007 at 12.)  While

2    Ryan was parked, he saw the door of Petitioner's truck open but could not see who

3    was getting in the truck.  (3/6/2007 at 11.)

4        The trial court denied the motion to suppress and found that the stop was

5    lawful.  (3/12/07 RT at 2–3.)

6                                    **DISCUSSION**

7    A.    <u>Standard of Review</u>

8        The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28

9    U.S.C. §§ 2254 <u>et seq</u>., prohibits a district court from granting a petition challenging

10   a state conviction that was decided on merits by a state court, unless that

11   adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

16   28 U.S.C. § 2254(d).

17       For purposes of § 2254(d)(1), a state court decision is "contrary to" Supreme

18   Court authority only if "the state court arrives at a conclusion opposite to that

19   reached by [the Supreme] Court on a question of law or if the state court decides a

20   case differently than [the Supreme] Court has on a set of materially indistinguishable

21   facts."  <u>Williams v. Taylor</u>, 529 U.S. 362, 413 (2000).  Similarly, a state court

22   decision is an "unreasonable application of" Supreme Court authority if "the state

23   court identifies the correct governing legal principle from [the Supreme] Court's

24   decisions but unreasonably applies that principle to the facts of the prisoner's case."

25   <u>Id.</u>

26       The only definitive source of clearly established federal law under AEDPA is

27   the holdings—as opposed to the dicta—of the Supreme Court as of the time of the

28   state court's decision.  <u>See</u> <u>Williams</u>, 529 U.S. 362, 412; <u>see also</u> <u>Marshall v.</u>

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court

For the Northern District of California

Rodgers, 133 S.Ct. 1446, 1449 (2013) ("The starting point for cases subject to § 2254(d)(1) is to identify the 'clearly established Federal law, as determined by the Supreme Court of the United States, that governs the habeas petitioner's claims.'"). Section 2254(d)(1) imposes a "highly deferential standard for evaluating state-court rulings," Lindh v. Murphy, 521 U.S. 320, 333 (1997), and prohibits a federal court from "substituting its own judgment for that of the state court," Woodford v. Visciotti, 123 S.Ct. 357, 360 (2002) (per curiam) (finding habeas relief improper when the state court decision was "merely erroneous").

The state court decision to which Section 2254(d) applies is the "last reasoned decision" of the state court. See Ylst v. Nunnemaker, 501 U.S. 797, 803–04 (1991); Barker v. Fleming, 423 F.3d 1085, 1091–92 (9th Cir. 2005). In this case, the order issued by the Santa Clara County Superior Court, Appellate Division is the last reasoned decision. In deciding whether no reasonable basis existed for the state court's decision, the district court "must determine what arguments or theories could have supported the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." Cullen v. Pinholster, 131 S. Ct. 1388, 1402 (2011) (internal quotations and punctuation omitted); see also Harrington v. Richter, 131 S. Ct. 770, 786 (2011) ("If this standard is difficult to meet—and it is—that is because it was meant to be.").

The Supreme Court has vigorously and repeatedly affirmed that under AEDPA, there is a heightened level of deference a federal habeas court must give to state court decisions. See Hardy v. Cross, 132 S. Ct. 490, 491 (2011) (per curiam); Harrington, 131 S. Ct. at 783–85 (2011); Felkner v. Jackson, 131 S. Ct. 1305 (2011) (per curiam). As the Court explained: "[o]n federal habeas review, AEDPA 'imposes a highly deferential standard for evaluating state-court rulings' and 'demands that state-court decisions be given the benefit of the doubt.'" Id. at 1307 (citation omitted). With these principles in mind regarding the standard and limited

scope of review in which this Court may engage in federal habeas proceedings, the Court addresses Petitioner's claims.

B.    Claims and Analysis

As grounds for federal habeas relief, Petitioner raises the following claims: (1) Petitioner was denied his right to present a defense by the state court's exclusion of bank surveillance photos and expert testimony analyzing the photos; (2) instructional error where the trial court failed to instruct that a lawful arrest was an element of the refusal enhancement and failed to define a lawful arrest; (3) instructional error where trial court used the wrong definition of billy; (4) *Miranda* violation when the trial court admitted statements that Petitioner made while in custody after Petitioner invoked his right to counsel; (5) prosecutorial misconduct; (6) the prohibition on carrying non-concealed weapons for self-defense set forth in Section 12020 of the California Penal Code violates the Second Amendment; and (7) ineffective assistance of counsel for failure to object to the car search.

1.    Right to Present a Defense

Petitioner's first claim is that the trial court's exclusion of bank video surveillance photos and expert testimony analyzing these photos violated his right to present a defense. Petitioner further argues that the appellate court's failure to address this issue was contrary to the Supreme Court's decision in Crane v. Kentucky, 476 U.S. 683 (1986).

"[T]he Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" Holmes v. South Carolina, 547 U.S. 319, 324 (2006) (quoting Crane, 476 U.S. at 690 (1986)). The constitutional right to present a complete defense includes the right to present evidence, including the testimony of witnesses. See Washington v. Texas, 388 U.S. 14, 19 (1967). But the right is only implicated when the evidence the defendant seeks to admit is "relevant and material, and . . . vital to the defense." Id. at 16. Additionally, a violation of the

United States District Court

For the Northern District of California

right to present a defense does not occur any time such evidence is excluded, but rather only when its exclusion is "arbitrary or disproportionate to the purposes [the exclusionary rule applied is] designed to serve." Holmes, 547 U.S. at 324 (internal citation and quotation marks omitted); Michigan v. Lucas, 500 U.S. 145, 151 (1991). "Only rarely" has the Supreme Court held that the right to present a complete defense was violated by the exclusion of defense evidence under a state rule of evidence. Nevada v. Jackson, 133 S. Ct. 1990, 1992 (2013) (citing Holmes, 547 U.S. at 331 (rule did not rationally serve any discernable purpose). A violation of the right to present a defense merits habeas relief only if the error was likely to have had a substantial and injurious effect on the verdict. See Lunbery v. Hornbeam, 605 F.3d 754, 762 (9th Cir. 2010) (citing Brecht v. Abrahamson, 507 U.S. 619, 637–38 (1993)).

   In a pre-trial suppression hearing, the parties litigated the lawfulness of the stop of Petitioner's car. During the suppression hearing, Petitioner presented pictures captured from a bank security camera at the corner of Ramona and Lytton. The pictures were intended to show that Agent Ryan did not have probable cause to stop Petitioner. The trial court denied the motion to suppress and found that the stop was lawful as follows:

> The experts' testimony was basically that the Defendant's car and the Police Officer's car were too far apart and that is the reason why the two cars are not visible together in any of the photos, which according to the expert means that the Officer's patrol car was not immediately behind the Defendant's car when approaching the intersection of Ramona and Lytton.
>
> However, it is this Court's opinion, based on all the evidence, this does not discredit the Officer's testimony. He testified that he personally observed the illegal left turn as he came down on Ramona toward the intersection at Lytton.
>
> The Officer testified that he observed the illegal turn and he gave a reasonable explanation why his car may not have been visible in any of the photos with the Defendant's pickup.
>
> I also find Mr. Connolly's and Mr. Webb's testimony was not believable because of its preciseness. Both gave the exactly same time up to the minute, two different witnesses at two different locations. That, I did not believe.
>
> According to Agent Ryan, he stopped the Defendant's car from making an

United States District Court

For the Northern District of California

1    unsafe turn in the path of an oncoming car.  This testimony was not
2    contradicted.

3    Therefore, I find that the car stop was lawful and the Motion to Suppress is
     denied.

4    (3/12/07 RT at 2–3.)

5         Prior to trial, Petitioner moved to admit the photos that had been presented at

6    the suppression hearing and to admit the related expert testimony.  (CT at 804.)  The

7    prosecution opposed this motion, arguing that (1) this evidence did not meet the

8    requirements of section 801 of the California Evidence Code, and that (2) this

9    evidence would unduly consume time and had a high likelihood of misleading the

10   jury, in violation of section 352 of the California Evidence Code.  (CT at 824–30.)

11   The trial court denied Petitioner's motion to admit the evidence, stating these photos

12   had been used to contest the legality of the traffic stop, which had already been fully

13   litigated.  (RT at 35.)  In response, Petitioner's counsel stated that admission of the

14   photos was not intended to re-litigate whether Agent Ryan had probable cause to

15   stop Petitioner, but rather whether Agent Ryan was telling the truth as to what

16   occurred that night.  (RT at 35.)  The trial court stated that if the credibility of Agent

17   Ryan came up at trial, the trial court would reconsider whether to admit the

18   evidence.  (RT at 35.)  Later that day, Petitioner argued that the photos were relevant

19   because they supported an argument that Agent Ryan was dishonest about why he

20   had stopped Petitioner, and that Petitioner may have refused the chemical test

21   because he believed that Agent Ryan was being dishonest.  (RT at 49–54.)

22   However, Petitioner's counsel also conceded that the violation and stop were not in

23   the camera's range.  (RT at 52.)  After hearing argument on the motion, the trial

24   court denied the motion, stating that the photos showed a "little snippet of time;"

25   that the trial court did not see the relevance of that small time period to Agent

26   Ryan's credibility; and that the probative value was substantially outweighed by the

27   undue consumption of time.  (RT at 56.)

28        To the extent that this evidence was intended to attack Agent Ryan's

United States District Court

For the Northern District of California

1   credibility — which is what Petitioner stated at the motion in limine hearing[4] — the

2   exclusion was neither arbitrary nor disproportionate to the purposes of Section 352

3   of the California Evidence Code.  In denying the motion for a new trial, the trial

4   court estimated that admitting the evidence would turn a 4 to 5 day trial into a two

5   week trial.  (CT at 1195.)  The trial court also noted that the tapes and photographs

6   were not continuous, were pieced together from multiple cameras, and were

7   dependent on mathematical calculations.  (CT at 1196.)  Given these concerns, the

8   trial court's exclusion of the evidence was within the scope of Section 352.

9   Moreover, exclusion of this evidence did not deny Petitioner a chance to present his

10  defense that Agent Ryan was untruthful.  Petitioner was able to attack Agent Ryan's

11  credibility in other ways.  Colon and Grillo challenged the reliability of Agent

12  Ryan's reports, testifying that they never said that Petitioner was intoxicated.

13  Petitioner also elicited from Agent Ryan an admission that the declaration that he

14  had submitted in a related federal case had been altered to delete the information

15  about Petitioner's medical conditions that might have affected his performance on

16  the field sobriety tests.  (RT at 195–97.)

17          Assuming arguendo that it was error to exclude this evidence, the exclusion

18  did not have a substantial and injurious effect on the verdict.  There was ample

19  evidence outside of Agent Ryan's testimony that supported a finding that Petitioner

20  was guilty of the charges:  Qadri's testimony regarding Petitioner's behavior at

21  NOLA; Officer Guy's testimony regarding Petitioner's performance on the first set

22  of field sobriety tests and Petitioner's behavior; the video of Petitioner at the police

23  _____

24          [4]During the hearing the Court stated: "Okay, now this [evidence] is all part of
    the legality of the stop.  It has been fully and — fully litigated at great length.  I
25  know you may want to use some of it to attack the credibility of the officer.  If that
    comes up during the trial, we will revisit it; but at this time, it is part and was part of
26  your motion to suppress and will not be litigated again during the trial.  And so your
    motion to admit the bank video surveillance tape is denied."  (RT at 35.)  Petitioner
27  responded: "If I may, with all respect, Your Honor.  We're not litigating —
    relitigating whether or not the officer had probable cause.  This is the gravamen of
28  the entirety of the case, whether this officer is telling the truth as to what happened."
    (RT at 35.)

United States District Court

For the Northern District of California

1  station; and Petitioner's bar tab.  Accordingly, to the extent that Petitioner argues

2  that the exclusion of the evidence pursuant to Section 352 violated his right to

3  present a defense that Agent Ryan was not credible, this claim for habeas relief is

4  denied.  <u>Holmes</u>, 547 U.S. at 324 (violation of right to present defense occurs only

5  when its exclusion is arbitrary or disproportionate to the purposes of the

6  exclusionary rule applied).

7        Petitioner also contends that the evidence was necessary to support a defense

8  that his arrest was unlawful, and that therefore his refusal to take a chemical test was

9  not consistent with a consciousness of guilt.  However, assuming arguendo that it

10  was error to exclude evidence that challenged the lawfulness of the arrest, the Court

11  finds that the exclusion did not have a substantial and injurious effect on the verdict

12  because, as discussed above, there was ample evidence outside of Petitioner's

13  refusal to take a chemical test that supported a finding that Petitioner was guilty of

14  the charges.

15        Moreover, Petitioner's argument that evidence bearing upon the lawfulness of

16  the arrest was necessary to his defense is defective in two ways.  First, Petitioner

17  presumes that the lawfulness of the arrest was an element of the implied consent law

18  that must be submitted to the jury.  However, as discussed below in Section B.2

19  <u>infra</u>, at the time of Petitioner's arrest, the lawfulness of the arrest was a legal issue

20  to be decided by a judge in a motion to suppress which should be heard prior to trial,

21  and was not an element to be submitted to the jury separate from the elements of

22  driving under the influence of alcohol.  Second, whether Petitioner committed a

23  traffic infraction was not at issue.  Petitioner argues that evidence that he did not

24  commit a traffic violation was relevant to whether he was under the influence per

25  CALCRIM 2110.  However, the jury heard no evidence that Petitioner drove badly,

26  which defense counsel emphasized during closing argument.  (RT at 496 and 502.)

27  The safety of Petitioner's driving was not at issue.

28        Taking into account the heightened level of deference that a federal habeas

United States District Court

For the Northern District of California

1   court must given to state court decision, the Court finds that the state court's ruling

2   was not objectively unreasonable.  Habeas relief is warranted only if the

3   constitutional error at issue had a "'substantial and injurious effect or influence in

4   determining the jury's verdict.'"  Penry v. Johnson, 532 U.S. 782, 795–96 (2001)

5   (quoting Brecht, 507 U.S. at 638).  Whether a trial error had a substantial and

6   injurious effect is not to be analyzed in terms of burdens of proof.  O'Neal v.

7   McAninch, 513 U.S. 432, 436–37 (1995); Mancuso v. Olivarez, 292 F.3d 939, 950

8   n.4 (9th Cir. 2002) (reviewing court must determine independently whether trial

9   error had substantial and injurious effect, without consideration of burdens of proof).

10  Instead, the proper question in assessing harm in a habeas case is,  "'Do I, the judge,

11  think that the error substantially influenced the jury's decision?'"  O'Neal, 513 U.S.

12  at 436.  If the court is convinced that the error did not influence the jury, or had but

13  very slight effect, the verdict and the judgment should stand.  Id. at 437.  Here, the

14  evidence which Petitioner sought to introduce would not have affected the jury's

15  decision.  Petitioner alleged that the photos would have established that Agent

16  Ryan's patrol car was not stopped behind Petitioner's truck and that Agent Ryan did

17  not see Petitioner make an illegal left turn.  However, there was no testimony

18  regarding an illegal left turn or unsafe driving and there was substantial evidence

19  supporting a finding that Petitioner was intoxicated, as discussed above.  The jury's

20  decision would not have been affected by evidence regarding whether Petitioner

21  made an illegal left turn.

22      Nor was the state court's rejection of this claim contrary to the Supreme

23  Court's decision in Crane v. Kentucky, 476 U.S. 683 (1986).  In Crane, the Supreme

24  Court held that the petitioner had been denied his right to present a complete defense

25  when the trial court excluded competent, reliable evidence bearing on the credibility

26  of a confession that was central to the defendant's claim of innocence.  476 U.S. at

27  690.  In Crane, the prosecution's case rested almost entirely on the petitioner's

28  confession and the statement of his uncle.  Id. at 685.  Also, the trial court failed to

"advance[] any reasonable justification for the wholesale exclusion of this body of potentially exculpatory evidence." Id. at 688.  In contrast, here, there were three different witnesses and other evidence that supported a finding that Petitioner was intoxicated, and the trial court excluded the evidence after finding that the probative value was substantially outweighed by the undue consumption of time.

In sum, the state court's rejection of this claim was neither contrary to, or an unreasonable determination of, clearly established federal law.  Nor was it an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

> 2)    Instructional Error Claims

To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.  See Estelle v. McGuire, 502 U.S. 62, 72 (1991); Cupp v. Naughten, 414 U.S. 141, 147 (1973); see also Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974) ("'[I]t must be established not merely that the instruction is undesirable, erroneous or even "universally condemned," but that it violated some [constitutional right].'").  The instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record.  See Estelle, 502 U.S. at 72.  In other words, the court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process.  United States v. Frady, 456 U.S. 152, 169 (1982) (citing Henderson v. Kibbe, 431 U.S. 145, 154 (1977)).  The defined category of infractions that violate fundamental fairness is very narrow:  "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation." Estelle, 502 U.S. at 73.

A jury instruction that omits an element of an offense is constitutional error subject to "harmless error" analysis.  See Neder v. United States, 527 U.S. 1, 8–11 (1999) (direct review); Evanchyk v. Stewart, 340 F.3d 933, 940 (9th Cir. 2003)

(§ 2254 case); <u>Spicer v. Gregoire</u>, 194 F.3d 1006, 1008 (9th Cir. 1999) (§ 2254

case).  Harmless error applies whether the error is characterized as a misdescription

of an element of an offense in a jury instruction, or as an omission of the element.

<u>See</u> <u>California v. Roy</u>, 519 U.S. 2, 5 (1996) (omission of "intent" element from

aiding and abetting instruction subject to harmless error analysis where jury could

have found intent based on evidence it considered).  The omission will be found

harmless unless it "'had substantial and injurious effect or influence in determining

the jury's verdict.'"  <u>Roy</u>, 519 U.S. at 4 (quoting <u>Brecht</u>, 507 U.S. at 637); <u>see</u> <u>Roy</u>

<u>v. Gomez</u>, 108 F.3d 242, 242 (9th Cir. 1997) (on remand after <u>California v. Roy</u>).

a)    Lawful Arrest

Petitioner argues that the state court's failure to instruct that a lawful arrest

was an element of the refusal enhancement and its failure to define a lawful arrest

deprived Petitioner of his right to have the jury make a finding on every element of

the offense.  The state court rejected this argument as follows:

> The alleged instructional error on the enhancement was harmless error.
> Because the jury found beyond a reasonable doubt that appellant had driven
> under the influence of alcohol, the jury found that appellant's arrest was
> lawful.  Requiring a lawful arrest element on the enhancement was merely
> duplicating an element that had already been found on the substantive charge
> of driving under the influence.

Respondent correctly points out that a state determination regarding the elements of

an offense is not open to challenge on federal habeas review.  <u>Stanton v. Benzler</u>,

146 F.3d 726, 728 (9th Cir. 1998); <u>see</u>, <u>e.g.</u>, <u>Jackson v. Virgina</u>, 443 U .S. 307, 324

n. 16 (1979) (sufficiency of the evidence claim in federal habeas must be analyzed

"with explicit reference to the substantive elements of the criminal offense as

defined by state law").  This Court is bound by state court rulings on state law.  <u>See</u>

<u>Estelle</u>, 502 U.S. at 67–68 ("it is not the province of a federal habeas court to

reexamine state-court determinations on state-law questions").  Here, in denying

Petitioner's motion for a new trial, the state trial court found that the lawfulness of

the arrest is a legal issue to be decided by a judge in a motion to suppress which

1    should be heard prior to trial, and lawfulness of arrest is not an element to be

2    submitted to the jury separate from the elements of driving under the influence of

3    alcohol.  (CT at 1193–94.)

4          Petitioner argues that Respondent's assertion is factually untrue because

5    lawfulness of the arrest as an the element of the offense had already been established

6    by the statute itself (Cal. Veh. Code § 23162(a)); by the state's official jury

7    instruction on the refusal enhancement and the accompanying Bench Notes; and by

8    the California Court of Appeal's decision in <u>Music v. Dep't of Motor Vehicles</u>, 270

9    Cal. Rptr. 692  (Cal. Ct. App. 1991) which Petitioner argues holds that a lawful

10   arrest is a necessary predicate for the application of the refusal enhancement.  <u>See</u>

11   Traverse at 28.  At best, Petitioner has established that before a refusal enhancement

12   can be submitted to the jury, the prosecution must first obtain a legal ruling that

13   there was a lawful arrest.  Petitioner has not established that California law, at that

14   time, considered lawfulness of the arrest an element of the offense.  Moreover, as the

15   state court noted, the jury's guilty finding on the driving under the influence charge

16   constituted a finding that the arrest was lawful.   The state court's rejection of this

17   claim was neither contrary to, or an unreasonable determination of, clearly

18   established federal law.  Nor was it an unreasonable determination of the facts in

19   light of the evidence presented in the state court proceeding.

20              b)      Definition of billy

21          Petitioner argues that the jury instruction defining "billy" constituted

22   instructional error because it (1) violated the rule of lenity by failing to interpret

23   Section 12020 of the California Penal Code in Petitioner's favor; and

24   (2) retroactively applied a broader definition of Section 12020 to Petitioner.

25   Petitioner also argues that Section 12020 is void for vagueness.  Respondent argues

26   that the Appellate Division of the Santa Clara County Superior Court's rejection of

27   this claim constituted a state court ruling on state law, and is therefore not

28   cognizable in habeas.

1

2

3

4

     The Appellate Division of the Santa Clara County Superior Court rejected this claim, stating: "There was no instructional error in the jury instruction for the billy offense.  The instruction given properly defined a weapon of that class which the legislature intended to prohibit."  (Docket No. 18, Ex. 7.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

     Petitioner's claim is without merit.  The "rule of lenity"  (i.e., a rule that ambiguous criminal statutes should be construed favorably to defendants) is inapplicable here.  The rule of lenity is a rule of statutory construction rather than a constitutional command.  See Sabetti v. DiPaolo, 16 F.3d 16, 19 (1st Cir. 1994). "'[N]othing in the federal constitution requires a state court to apply the rule of lenity when interpreting a state statute.'  Bowen v. Romanowski, No. Civ. 05–cv–72754–DT, 2005 WL 1838329, at *2 (E.D.Mich. Aug. 2, 2005) (citing Sabetti v. Dipaolo, 16 F.3d 16, 19 (1st Cir.), cert. denied, 513 U.S. 916 (1994)); cf. Lurie v. Wittner, 228 F.3d 113, 126 (2nd Cir. 2000) ("The rule of lenity is a canon of statutory construction, not in itself federal law.") (citing United States v. Torres-Echavarria, 129 F.3d 692, 698 n .2 (2nd Cir.1997), cert. denied, 522 U.S. 1153 (1998), and United States v. Harris, 959 F.2d 246, 258 (D.C. Cir.), cert. denied, 506 U.S. 932, 933 (1992)), cert. denied, 532 U.S. 943 (2001)."  Walker v. Warden, Chillicothe Corr. Inst., No. 1:08-CV-580, 2010 WL 419942, at *12 (S.D. Ohio Jan. 29, 2010).  The case cited by Petitioner does not hold otherwise; in U.S. v. Santos, 533 U.S. 507 (2008), the Supreme Court reviewed a *federal* court's construction of a *federal* statute.  553 U.S. at 514.

22

23

24

25

26

27

28

     The state's alleged failure to apply this rule of statutory construction cannot be the basis for federal habeas relief.  A person in custody pursuant to the judgment of a state court can obtain a federal writ of habeas corpus only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a).  In other words, a writ of habeas corpus is available under § 2254(a) "only on the basis of some transgression of federal law binding on the state courts."  Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v.

United States District Court

For the Northern District of California

United States District Court
For the Northern District of California

1    <u>Isaac</u>, 456 U.S. 107, 119 (1982).  Petitioner's claim that the state court incorrectly

2    defined billy by using a broader definition is a claim that the state court erred in

3    applying state law, and is not cognizable on federal habeas.  <u>Estelle</u>, 502 U.S. at

4    67–68 (1991) (federal habeas relief unavailable for violations of state law or for

5    alleged error in the interpretation or application of state law); <u>see</u>, <u>e.g.</u>, <u>Little v.</u>

6    <u>Crawford</u>, 449 F.3d 1075, 1082 (9th Cir. 2006) (claim that state supreme court

7    misapplied state law or departed from its earlier decisions does not provide a ground

8    for habeas relief); <u>Stanton</u>, 146 F.3d at 728.

9        Petitioner's claim that the trial court retroactively applied a broader definition

10   of Section 12020 to him is also without merit.  The relevant event took place on May

11   5, 2008.  As of that date, there was a California Supreme Court case, <u>People v.</u>

12   <u>Grubb</u>, 47 Cal. Rptr. 772 (1965), which held that an altered baseball bat, taped at the

13   smaller end, heavier at the other end and carried around in a car, obviously not for

14   playing baseball, is a "billy."  47 Cal. Rptr. at 778.  Petitioner accordingly had notice

15   that his baton could be considered a billy.  The case relied upon by Petitioner,

16   <u>People v. Mulherin</u>, 35 P.2d 174 (Cal. Ct. App. 1934) was issued by a lower court

17   twenty years prior to <u>Grubb</u> and therefore does not supersede a California Supreme

18   Court opinion.  Moreover, the fact that the CALCRIM 2500 Bench Notes cite to

19   <u>Mulherin</u> for the definition of a "billy" does not render <u>Mulherin</u> law.  <u>See</u>, <u>e.g.</u>,

20   <u>People v. Morales</u>, 25 Cal.4th 34, 48, fn. 7 (2001) ("jury instructions, whether

21   published or not, are not themselves the law, and are not authority to establish legal

22   propositions or precedent.  They should not be cited as authority for legal principles

23   in appellate opinions.").

24       Finally, the Court also finds that Petitioner's void-for-vagueness argument is

25   without merit.  "[T]he void-for-vagueness doctrine requires that a penal statute

26   define the criminal offense with sufficient definiteness that ordinary people can

27   understand what conduct is prohibited and in a manner that does not encourage

28   arbitrary and discriminatory enforcement."  <u>Kolender v. Lawson</u>, 461 U.S. 352, 357,

United States District Court

For the Northern District of California

1    (1983) (citing <u>Grayned v. City of Rockford</u>, 408 U.S. 104, 108–09 (1972)). In a

2    vagueness challenge, a court must look to the plain language of the statute, as well

3    as to state courts' interpretations of it.  <u>Nunez v. City of San Diego</u>, 114 F.3d 935,

4    941–42 (9th Cir. 1997) (citing <u>Kolender</u>, 461 U.S. at 355 n. 4).  A statute will meet

5    the "certainty required by the Constitution if its language conveys sufficiently

6    definite warning as to the proscribed conduct when measured by common

7    understanding and practices."  <u>Panther v. Hames</u>, 991 F.2d 576, 578 (9th Cir. 1993)

8    (citations omitted).  The state court denied Petitioner's claim that the definition of

9    "billy" constituted instructional error, but did not expressly address Petitioner's

10   vagueness argument.  Accordingly, this Court must "determine what arguments or

11   theories supported . . . or could have supported the state court's decision" and then

12   "must ask whether it is possible fairminded jurists could disagree that those

13   arguments or theories are inconsistent with the holding in a prior decision of [the

14   Supreme] Court."  <u>Harrington</u>, 131 S.Ct. at 786.

15        Unless First Amendment freedoms are implicated, "a vagueness challenge

16   may not rest on arguments that the law is vague in its hypothetical applications, but

17   must show that the law is vague as applied to the facts of the case at hand."  <u>United</u>

18   <u>States v. Johnson</u>, 130 F.3d 1352, 1354 (9th Cir. 1997) (citing <u>Chapman v. United</u>

19   <u>States</u>, 500 U.S. 453, 467 (1991)).  Here, Petitioner takes issue with the trial court's

20   failure to instruct with the definition of "billy" as set forth in <u>People v. Mulherin</u>,

21   which requires that a billy fit within a pocket, 35 P.2d at 176, and the trial court's

22   application of the definition set forth in <u>People v. Mercer</u>, 49 Cal. Rptr. 2d 728 (Cal.

23   Ct. App. 1995).  The <u>Mercer</u> court's definition of "billy" was taken from the 1986

24   edition of the Webster's New World Dictionary.  <u>Mercer</u>, 49 Cal. Rptr. 2d at 731

25   ("We note that Webster's New World Dictionary defines a 'billy' as 'a club or

26   heavy stick; truncheon, esp. one carried by a policeman.'  (Webster's New World

27   Dict. (2d college ed. 1986) p. 141.)  A 'truncheon' is defined as '1. a short, thick

28   cudgel; club 2. any staff or baton of authority 3. . . . a policeman's stick or billy . . . "

United States District Court

For the Northern District of California

1   (Id. at p. 1527.) .").  The state court could have reasonably concluded that the trial

2   court had interpreted "billy" to give it its usual and ordinary meaning by applying

3   the definition set forth in Mercer, which relies on a definition found in a mainstream

4   dictionary.   The state court could have reasonably concluded that Section 12020

5   was not vague as applied to the facts of the case at hand.  Accordingly, the state

6   court's rejection of Petitioner's contention that Section 12020's definition of "billy"

7   was void for vagueness was neither contrary to nor an unreasonable application of

8   clearly established federal law. Federal habeas relief is denied on this claim.

9            3)    Miranda violation

10            Petitioner argues that the trial court's admission of his statements regarding

11   the baton violated Edwards v. Arizona, 384 U.S. 436 (1996) because they were

12   made after Petitioner invoked his right to counsel.[5]  The state court rejected this

13   claim, stating: "[Petitioner's] statements did not violate Miranda."  (Docket No. 9,

14   Ex. 7 at 2.)  Respondent argues that Edwards is inapplicable because Petitioner was

15   not dealing with custodial interrogation by the police.

16            Agent Ryan testified that after he arrested Petitioner, he asked if Petitioner

17   was willing to take a breath test.  (RT at 134.)  Petitioner refused.  (RT at 134.)

18   Petitioner informed Agent Ryan that he wished to speak to an attorney before

19   submitting to any chemical test.  (RT at 136.)  Agent Ryan reminded him that there

20   is no right to speak to an attorney before submitting to chemical testing.  (RT at

21   136–38.)  Afterwards, Agent Ryan read Petitioner his Miranda rights.  (RT at 139.)

22   After reading Petitioner his Miranda rights, Agent Ryan asked Petitioner whether the

23   baton belonged to him.  (RT at 141.)  Petitioner responded that yes, the baton

24   belonged in the truck.  (RT at 141.)  He then asked if it was a misdemeanor in

25

26

27          [5]Petitioner invokes Edwards only when it benefits him.  Petitioner relied on
     his statement to Agent Ryan that he was hypoglycemic to offer another reason for
     the smell of alcohol in his breath.  However, his statement that he was hypoglycemic
28   was offered after he had received his Miranda warning (RT at 189) and would be
     considered inadmissible if Edwards applied to his statements in the booking area.

1    California to possess the baton.  (RT at 141–42.)

2         In reviewing this claim, the Court must again "determine what arguments or

3    theories supported . . . or could have supported the state court's decision" and then

4    "must ask whether it is possible fairminded jurists could disagree that those

5    arguments or theories are inconsistent with the holding in a prior decision of [the

6    Supreme] Court."  Harrington, 131 S.Ct. at 786.  "A state court's determination that

7    a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists

8    could disagree' on the correctness of the state court's decision."  Id. at 786 (citing

9    Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)); see also id. at 786–87

10   (petitioner must show that state court's decision "was so lacking in justification that

11   there was an error well understood and comprehended in existing law beyond any

12   possibility for fairminded disagreement.").

13        The Court finds that the state court could have reasonably concluded that

14   Petitioner's request for counsel with respect to the chemical test, and prior to

15   receiving his Miranda warnings, did not require a halt to all questioning pursuant to

16   Edwards v. Arizona.  In McNeil v. Wisconsin, 501 U.S. 171 (1991), the Supreme

17   Court distinguished between the Sixth Amendment right to counsel, which is

18   invoked when an individual requests counsel, and the Miranda-Edwards Fifth

19   Amendment right to counsel.  The McNeil court found that invoking one's Sixth

20   Amendment right to counsel did not constitute an invocation of one's right to

21   counsel under Miranda:

22        The purpose of the Sixth Amendment counsel guarantee — and hence the
          purpose of invoking it  — is to "protec[t] the unaided layman at critical
23        confrontations" with his "expert adversary," the government, *after* "the
          adverse positions of government and defendant have solidified" with respect
24        to a particular alleged crime.  U.S. v. Gouveia, 467 U.S. 180, 189 (1984).
          The purpose of the Miranda-Edwards guarantee, on the other hand  — and hence
25        the purpose of invoking it — is to protect a quite different interest: the
          suspect's "desire to deal with the police only through counsel," Edwards v.
26        Arizona, 451 U.S. 477, 484 (1981).  This is in one respect narrower than the
          interest protected by the Sixth Amendment guarantee (because it relates only
27        to custodial interrogation) and in another respect broader (because it relates to
          interrogation regarding *any* suspected crime and attaches whether or not the
28        "adversarial relationship" produced by a pending prosecution has yet arisen).

1
2
3
4

> To invoke the Sixth Amendment interest is, as a matter of *fact*, *not* to invoke the <u>Miranda</u>-<u>Edwards</u> interest. . . . [T]he *likelihood* that a suspect would wish counsel to be present is not the test for applicability of <u>Edwards</u>. The rule of that case applies only when the suspect "ha[s] expressed" his wish for the particular sort of lawyerly assistance that is the subject of <u>Miranda</u>. <u>Edwards</u>, 451 U.S. at 484 (emphasis added). It requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney in dealing with custodial interrogation by the police.

5
6

<u>McNeil</u>, 501 U.S. at 177–78 (emphasis in original). The <u>McNeil</u> court rejected

7

Petitioner's proposed bright-line rule that there should be no police-initiated

8

questioning of any person in custody who has requested counsel to assist him in

9

defense or interrogation. <u>Id.</u> at 181. Applying the above reasoning, the <u>McNeil</u>

10

court found that an accused's invocation of his Sixth Amendment right to counsel

11

during a judicial proceeding did not constitute an invocation of the right to counsel

12

derived by <u>Miranda</u>. <u>Id.</u> at 177–82.

13

Fair-minded jurists could reasonably disagree as to whether the state court

14

properly rejected Petitioner's <u>Miranda</u> claim. <u>McNeil</u> can reasonably be read as

15

finding that <u>Miranda</u> requires a clear invocation of the right to counsel *after* the

16

<u>Miranda</u> warning was given. <u>Cf.</u> <u>U.S. v. Ogden</u>, 572 F.2d 501, 502–03 (5th Cir.

17

1978) (finding no error in the admission of defendant's post-arrest inculpatory

18

statements where he requested a lawyer prior to being given <u>Miranda</u> warnings but

19

after being given <u>Miranda</u> warnings chose to inculpate himself). It is undisputed

20

that Petitioner did not request an attorney after he was advised of his <u>Miranda</u> rights.

21

However, because Petitioner's request for counsel can also be viewed as "an

22

expression of a desire for the assistance of an attorney in dealing with custodial

23

interrogation by the police," it can also be argued that <u>McNeil</u> requires that

24

Petitioner's pre-<u>Miranda</u> request for an attorney be treated as an invocation of the

25

<u>Miranda</u>-<u>Edwards</u> right to counsel. <u>McNeil</u>, 501 U.S. at 178. Because fairminded

26

jurists could disagree on the correctness of the state court's decision, the state

27

court's rejection of this claim precludes federal habeas relief. <u>Harrington</u>, 562 U.S.

28

at 101. However, the Court will grant a certificate of appealability on this issue.

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1

4)      Prosecutorial Misconduct

Petitioner argues that the prosecutor committed prosecutorial misconduct when he acted as a witness and advocate with respect to Colon; when he elicited false evidence regarding Colon's testimony; when he misstated the law regarding consciousness of guilt and regarding whether Miranda and "probable cause" were legal issues; and when he failed to disclose evidence of Qadri's DUI arrest.  The state court rejected this claim, stating: "Witness Qadri's misdemeanor DUI was irrelevant.  There was no showing of prosecutorial misconduct."  (Docket No. 9, Ex. 7 at 2.)

A defendant's due process rights are violated when a prosecutor's misconduct renders a trial "fundamentally unfair."  Darden v. Wainwright, 477 U.S. 168, 181 (1986).  Under Darden, the first issue is whether the prosecutor's remarks were improper; if so, the next question is whether such conduct infected the trial with unfairness.  Tan v. Runnels, 413 F.3d 1101, 1112 (9th Cir. 2005); see also Deck v. Jenkins, 768 F.3d 1015, 1023 (9th Cir. 2014) (recognizing that Darden is the clearly established federal law regarding a prosecutor's improper comments for AEDPA review purposes).  A prosecutorial misconduct claim is decided "'on the merits, examining the entire proceedings to determine whether the prosecutor's remarks so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  Johnson v. Sublett, 63 F.3d 926, 929 (9th Cir. 1995); see Trillo v. Biter, 769 F.3d 995, 1001 (9th Cir. 2014) ("Our aim is not to punish society for the misdeeds of the prosecutor; rather, our goal is to ensure that the petitioner received a fair trial.").

a)      False Argument

Petitioner argues that the prosecutor made a false argument to the jury when he argued in this closing argument that Petitioner had no reason to not give a chemical test except consciousness of guilt.  According to Petitioner, his refusal to give a chemical test could also be explained by the unlawfulness of the arrest, since

1    under California caselaw a driver has no obligation to take a chemical test if he is

2    unlawfully detained or arrested.  Petitioner also argues that the prosecutor

3    knowingly made a false statement since he was aware that Petitioner believed the

4    arrest to be unlawful.  The Court finds this claim to be without merit.

5            The Court agrees with Respondent that Petitioner has taken the sentence out

6    of context.  Petitioner challenges the last sentence of the following portion of the

7    prosecutor's closing argument:

8            Ladies and gentlemen, to find reasonable doubt in this case you got to believe
         Shiraz Qadri lied about a complete stranger; Agent Ryan lied about a complete
9            stranger that night; Officer Guy lied about a complete stranger that night; that
         defendant just can't follow instructions; that he just has horrible balance,
10           despite being a wrestler which requires great balance.  He lies about alcohol for
         no reason.  He had some good reason not to blow besides guilt, and he was
11           willing to take the consequences for some reason besides being guilty.

12   (RT at 524.)  Petitioner claims that the prosecutor's argument conveyed to the jury

13   the false and misleading impression that Petitioner had no other reason for refusing

14   the test except consciousness of guilt.  However, read in context, it is also read as the

15   prosecution's summary and characterization of Petitioner's defense which is that

16   Qadri, Ryan and Guy were unreliable witnesses; that Petitioner's poor performance

17   on the sobriety tests was attributable to causes other than his intoxication; and that

18   Petitioner had another reason, such as frustration with an unjustified stop, for not

19   submitting to the breath test.  In fact, the defense specifically argued that Petitioner

20   may have refused the breath test because he believed it was futile because he was

21   subject to an unjustified stop and then arrested despite his innocence:

22           Stopped for no reason.  Now, think about this.  This is huge, ladies and
         gentleman.  The judge gave an instruction that the manner of driving the
23           vehicle was not definitive but something to be determined.  Did you hear Agent
         Ryan say that Mr. Robertson did anything to break the law?  No.  Was the
24           impression you are left the impression Mr. Robertson was left with?  Hey,
         guys, watch out, there goes the police.  See you later.  Get in my car with
25           Tennessee tags, drive, and all of a sudden, "Whoop, whoop, whoop."  What did
         I do?  I didn't do anything.  Officer, I didn't do anything.  You've been
26           drinking, boy.  Can you see why he's afraid?  Can you see why Mr. Robertson
         starts right out what is going on here?  Nothing about him doing anything
27           wrong?

28           Then as if matters aren't bad enough, he's told that not this (indicating) but this

is a felony for which he can go to jail, lose his law license, and everything else? Can you imagine why he's afraid? And he get frustrated. I didn't have anything to drink. I'm the designated driver.

. . .

Futility. Despite telling the officer he hadn't anything to drink, despite never having done anything wrong, despite trying his best on these field sobriety tests, he gets arrested. He gets taken down to the holding area, booking room. He tries to explain everything to the officer. . . .

Here's the jury instruction. If Mr. Robertson refused to submit to a chemical test after the officer asked him to do so and explained the nature to Wade, then Wade's conduct may show. It is not definitive. It's a maybe. But balance it. If his mind is guilty, why is he going to keep talking to the officer. Why is he going to explain to the officer? Why he is going to redo the test? A guilty person doesn't do that.

It's up to you to decide the meaning and importance of the refusal. Well, Mr. Robertson has been trying to convince Agent Ryan the entire time, I didn't drive badly. I didn't drink. Go back and ask the people at the bar. There's two waitresses over there they will tell you they didn't see him drinking. No, it's all futile for Mr. Robertson.

Even if you find that he did refuse, and he did, I'm not saying he didn't refuse, that can't prove guilty by itself. Okay, Mr. Robertson, you refused. Okay, fine. Doesn't mean he's guilty of driving under the influence, which is the crime here. So you can say you are right, [prosecutor Shearer], but you didn't prove he was driving under the influence.

RT at 480–83. After evaluating the prosecutor's statement in the context of the entire trial, the Court finds that the state court reasonably determined that the prosecution did not misstate the law.

In addition, the state court reasonably determined that the prosecutor did not offer a false statement. The fact that Petitioner argued that he was unlawfully arrested at a suppression hearing does not mean that the prosecutor cannot, in good faith, believe that the evidence shows that Petitioner was lawfully arrested and that therefore his refusal could indicate consciousness of guilt.

The Court also notes that the trial court specifically instructed the jurors that they were to disregard the attorneys' comments on the law if the comments conflicted with the trial court's instructions (RT at 447), and that nothing the attorneys said, including in their closing arguments, constituted evidence (RT at 450).

United States District Court

For the Northern District of California

1    After having examined the entire record, the Court finds that the prosecutor's

2    comment regarding why Petitioner may have refused the breath test did not "'so

3    infect[] the trial with unfairness as to make the resulting conviction a denial of due

4    process.'"  Darden, 477 U.S. at 181 (citing Donnelly, 416 U.S. 637).  The state

5    court's rejection of this claim was not contrary to, or an unreasonable application of,

6    clearly established federal law.

7                    b)    Brady violation

8        Petitioner argues that the prosecutor withheld exculpatory evidence

9    impeaching its key witness, Qadri, who gave the lay opinion that Petitioner was

10   intoxicated.  The state court denied this claim, stating: "Witness Qadri's

11   misdemeanor DUI was irrelevant."  (Docket No. 9, Ex. 7 at 2.)

12       After the start of trial, the prosecution disclosed that Qadri had a

13   misdemeanor and was on probation but provided no information regarding where the

14   arrest or conviction took place.  (CT at 1004.)  The trial court granted the

15   prosecutor's request to preclude the defense from questioning Qadri about this

16   conviction because it was not a conviction of moral turpitude.  (CT at 822.)

17   The police report and court file, obtained after trial, indicate that on October 29,

18   2006, Qadri was arrested for DUI, pled guilty to the charge, and was on probation

19   for that offense at the time of Petitioner's trial.  (CT at 1007–31.)  In denying the

20   new trial motion, the trial court noted that it was Petitioner's choice to wait until the

21   end of trial to obtain Qadri's police report and court file, and that his information

22   was easily accessible to Petitioner since it was in the same building in which the trial

23   was behind held.  (CT at 1197.)

24       Petitioner argues that the police report indicated that Qadri lied when he

25   informed the police at the time of the arrest that he only had two beers since Qadri's

26   blood alcohol level ("BAC") was .20; that Qadri's ability to drive a car with a .20

27   BAC indicates that he is a heavy drinker, if not an alcoholic; that Qadri had likely

28   been drinking when he saw Petitioner; and that he was a poor judge of whether a

1   person was intoxicated since he estimated his alcohol intake as two beers, instead of

2   ten. (Pet. at 51–52.)   Accordingly, concludes Petitioner, the details of the

3   conviction would have been "key impeachment material" and constituted

4   exculpatory evidence. (Pet. at 51.)

5          In Brady v. Maryland, 373 U.S. 83 (1963), the Supreme Court held that "the

6   suppression by the prosecution of evidence favorable to an accused upon request

7   violates due process where the evidence is material either to guilt or to punishment,

8   irrespective of the good faith or bad faith of the prosecution." Id. at 87.  The

9   Supreme Court has since made clear that the duty to disclose such evidence applies

10   even when there has been no request by the accused, United States v. Agurs, 427

11   U.S. 97, 107 (1976), and that the duty encompasses impeachment evidence as well

12   as exculpatory evidence, United States v. Bagley, 473 U.S. 667, 676 (1985).

13   Evidence is material if "there is a reasonable probability that, had the evidence been

14   disclosed to the defense, the result of the proceeding would have been different."

15   Cone v. Bell, 556 U.S. 449, 469–70 (2009).  "A reasonable probability does not

16   mean that the defendant 'would more likely than not have received a different

17   verdict with the evidence,' only that the likelihood of a different result is great

18   enough to 'undermine confidence in the outcome of the trial.'" Smith v. Cain, 132

19   S. Ct. 627, 630 (2012) (quoting Kyles v. Whitley, 514 U.S. 419, 434 (1995)).

20          The Court finds that the state court's rejection of this claim was neither

21   contrary to, nor an unreasonable application of, clearly established federal law.

22   Petitioner has failed to demonstrate that Qadri's misdemeanor DUI conviction was

23   relevant or material.  Petitioner's conclusions that the details of the conviction

24   established that Qadri was a liar, a heavy drinker, and a poor judge of sobriety are

25   purely speculative.  Whether a "reasonable probability" exists that Petitioner would

26   have received a different verdict may not be based on mere speculation without

27   adequate support. See Wood v. Bartholomew, 516 U.S. 1, 6–8 (1995).

28   //

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

c)    Advocate-Witness Rule

Petitioner argues that the prosecutor improperly acted as a witness, thereby violating his due process rights.  According to Petitioner, the prosecutor behaved improperly as follows.  On the eve of trial, the prosecutor made a taped phone call to Colon.  (RT at 37.)  The prosecutor states that the purpose of the call was to discuss Petitioner's behavior the night he was arrested, and the relationship between Grillo and Petitioner.  (RT at 37.)  Petitioner argues that the prosecutor misleadingly obtained Colon's assent that Agent Ryan's police report was fairly accurate by reading Colon a version of the police report that omitted a sentence that Colon had repeatedly stated was inaccurate.  (RT at 60–62.)  Petitioner requested that the Court recuse prosecutor due to these events, which the Court declined to do.  (RT at 60–66, 70 and CT at 832–38.)  Petitioner argues that in his closing argument, the prosecutor made himself an unsworn witness by vouching to the trial court and to the jury the version of events with regard to Colon's statement as the prosecutor had witnessed them.

| | |
|---|---|
| Prosecution: | At the end of this day regarding the DUI the People have shown that Shiraz Qadri said he was intoxicated; Agent Ryan said he was intoxicated; Officer Guy said he was intoxicated; even the defense expert said he had 20 clues of being under the influence of alcohol consider both sets of FST's.  He even said the defendant should have just blown if he was innocent.  All of those things, and then you have Tiffany Colon's prior statement where she said he was drinking or becoming intoxicated. |
| Defense: | Objection; misstates the evidence.  There's no prior statement from Ms. Colon as to that. |
| Court: | Where are you getting that from? |
| Prosecution: | When I read her if that was a correct statement at the time, Your Honor, and she said yes. |
| Court: | The objection is overruled. |

(RT 526–27.)

After reviewing the record, the Court finds that the state court's rejection of

United States District Court

For the Northern District of California

1    this claim of prosecutorial misconduct was neither contrary to, nor an unreasonable

2    application of, clearly established federal law.  Put simply, it did not render the trial

3    fundamentally unfair.  The prosecution's statement that Colon had previously stated

4    that Petitioner was drinking and becoming intoxicated did not have a substantial and

5    injurious effect on the jury's verdict. As previously noted, the jury was specifically

6    instructed that the attorneys' statements were not evidence and the jury is presumed

7    to have followed those instructions.  See Weeks v. Angelone, 528 U.S. 225, 234

8    (2000).  Furthermore, the evidence in this case was strong against Petitioner, as the

9    prosecution detailed above.  In addition, the prosecution's statement is supported by

10   Colon's testimony.  On cross-examination, Colon agreed that her statement that

11   Petitioner, Grey and a third man were becoming intoxicated when she served them

12   drinks the night of April 27, 2006 was "pretty right on" and "an accurate reflection"

13   of her memory.  (RT at 249.)

14        Neither Berger v. U.S., 295 U.S. 78 (1935), nor U.S. v. Edwards, 154 F.3d

15   915 (9th Cir. 1998) compel a finding that the prosecutor's comments violated

16   Petitioner's due process rights.  In Berger, the Supreme Court was confronted with a

17   situation in which the conduct of the prosecuting attorney was not "slight or

18   confined to a single instance, but one where such misconduct was pronounced and

19   persistent, with a probable cumulative effect upon the jury which cannot be

20   disregarded as inconsequential."  Berger, 295 U.S. at 89.  The Court concluded that

21   "[i]f the case . . . had been strong, or . . . the evidence of his guilt overwhelming, a

22   different conclusion might be reached."  Id.  Finding that the case against the

23   petitioner was weak, the Supreme Court granted habeas relief.  Berger is not

24   applicable in this case because the prosecutor's alleged misconduct was neither

25   pronounced nor persistent, and the case against Petitioner is strong.  In Edwards,  the

26   Ninth Circuit found that the prosecutor's continued performance of his role as

27   prosecutor in case constituted a form of improper vouching that affected the

28   fundamental fairness of defendant's trial where the prosecutor was personally

United States District Court

For the Northern District of California

1   involved in the discovery of a critical piece of evidence, when that fact is made

2   evident to the jury, and when the reliability of the circumstances surrounding the

3   discovery of the evidence was at issue. Edwards, 154 F.3d at 924. Edwards is

4   distinguishable because, as discussed earlier, Colon's testimony was consistent with

5   the prosecution's statement. Accordingly, the Court denies federal habeas relief on

6   this claim.

7                    d)      Eliciting false testimony

8            Petitioner argues that the prosecutor knowingly elicited false testimony

9   because Colon had informed the prosecutor that she did not have a conversation with

10  Agent Ryan and that she did not tell Agent Ryan that Petitioner was intoxicated, yet

11  the prosecutor elicited from Agent Ryan testimony that Agent Ryan spoke with

12  Colon and that she said Petitioner was intoxicated. This claim was also denied by

13  the state court.

14          The government's knowing use of false testimony to convict a defendant

15  violates due process. Napue v. Illinois, 360 U.S. 264, 269 (1949). However, the

16  evidence is inconclusive as to whether Agent Ryan's testimony was false. It is

17  equally plausible that Colon mis-remembered the relevant events or was herself

18  presenting false testimony. Discrepancies in the testimonies of different witnesses

19  do not prove that the prosecution knowingly elicited false testimony. U.S. v. Zuno-

20  Acre, 44 F.3d 1420, 1423 (9th Cir. 1995). Inconsistencies are not only attributable

21  to lies, but also to errors in perception or recollection. Id. Determining the cause of

22  the discrepancies is a question for the jury. Id. The record does not support a

23  finding that Agent Ryan's testimony regarding the length of his conversation with

24  Colon and Colon's statement regarding Petitioner's level of intoxication was false.

25  The state court's rejection of this claim was neither contrary to, nor an unreasonable

26  application of, clearly established federal. Nor was it an unreasonable determination

27  of the facts in light of the evidence presented in the state court proceeding.

28  //

1

e)    Misstatements of the law

Petitioner claims that the prosecutor misstated the facts and the law in the following ways: by arguing that <u>Miranda</u> and probable cause were to be decided by the judge and not the jury; by stating that the prosecution learned that Grillo worked for Gray; by stating that the prosecution learned that Grillo was buddies with Petitioner; by stating that the prosecution decided before trial that Grillo would not be a helpful claim; and by claiming that it was a labor law violation for a bar manager to refund a tip to a customer.  This claim was rejected by the state court which found no prosecutorial misconduct.

The Court finds that these claims are without merit.  The Court agrees with Respondent that since the state court had determined that the jury did not need to determine whether Petitioner's arrest was lawful, the prosecutor did not misstate the law by stating that <u>Miranda</u> and probable cause were issues to be decided by the jury.  Nor were the statements regarding Grillo improper since they were reasonable inferences from the evidence.  <u>United States v. Bracy</u>, 67 F.3d 1421, 1431 (9th Cir. 1995) (prosecutor may draw reasonable inferences from the evidence and is not limited to a mere summary).  The state court's rejection of this claim was neither contrary to, nor an unreasonable application of, clearly established federal.  Nor was it an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

5)    Second Amendment violation

Petitioner argues that the version of Section 12020 of the California Penal Code that was in effect when he was convicted[6] violated the Second Amendment and that therefore his conviction under this statute must be set aside.  The state appellate court addressed this claim in one sentence, stating only that "Penal Code

---

[6]Section 12020 of the California Penal Code was repealed in 2012, pursuant to the nonsubstantive reorganization of statutes set forth in Senate Bill No. 1080, and recodified at Section 22210 of the California Penal Code which, in relevant part, prohibits the possession of a billy.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

section 12020(a)(1) does not violate the Second Amendment."  (Docket No. 9, Ex. 7 at 2.)  Petitioner argues that the state appellate court's finding was contrary to the Supreme Court's holding in <u>District of Columbia v. Heller</u>, 554 U.S. 570 (2008). Petitioner argues that <u>Heller</u> extended the Second Amendment "to all instruments that constitute bearable arms," <u>id</u>. at 582, including a billy.

The Court agrees with Respondent that the state appellate court's ruling was neither "contrary to, [nor] an unreasonable application of[] clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  In a habeas case governed by 28 U.S.C. § 2254(d), "[c]learly established federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions." <u>Williams</u>, 529 U.S. at 412; <u>cf</u>. <u>Alvarado v. Hill</u>, 252 F.3d 1066, 1068–69 (9th Cir. 2001) ("the question . . . is not whether [state law] violates due process as that concept might be extrapolated from the decisions of the Supreme Court.  Rather, it is whether [state law] violates due process under 'clearly established' federal law."). In <u>Heller</u>, the Supreme Court held that the District of Columbia's total ban on handgun possession in the home and its requirement that handguns be rendered inoperable when stored in a home violated the Second Amendment.  <u>Heller</u>, 544 U.S. at 635.  The Supreme Court's holding was limited to handguns.  Contrary to Petitioner's assertion, <u>Heller</u> did not, in its holding, specify what constituted "bearable arms."  <u>See</u>, <u>e.g.</u>, <u>id</u>. at 623 (acknowledging that <u>Miller v. United States</u>, 309 U.S. 174 (1939) holds that Second Amendment right "extends to only certain types of weapons") and 626 (noting that the right to bear arms under Second Amendment is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose").  Nor did <u>Heller</u> hold that the Second Amendment protected Petitioner's right to carry a billy.  Petitioner's reliance on <u>State v. Kessler</u>, 289 Or. 359, 361–62 (Or. 1980), and <u>Peruta v. County of San Diego</u>, 742 F.2d 1144 (9th Cir. 2014) are unpersuasive since neither case constitutes

1   clearly established Federal law for the purposes of federal habeas review under §

2   2254(d).  See, e.g., Parker v. Matthews, 132 S. Ct. 2148, 2155 (2012) ("circuit

3   precedent does not constitute clearly established Federal law, as determined by the

4   Supreme Court [and] therefore cannot form the basis for habeas relief under

5   AEDPA") (internal quotation and citation omitted).  Accordingly, Petitioner is not

6   entitled to habeas relief on this claim.

7           6)      Ineffective Assistance of Counsel

8           Petitioner argues that trial counsel was ineffective for failing to adequately

9   object to the car search for the reasons set forth in Arizona v. Gant, 556 U.S. 332

10  (2009).  In Gant, the Supreme Court held that the police may search a vehicle

11  incident to a recent occupant's arrest only if the arrestee is within reaching distance

12  of the passenger compartment at the time of the search or it is reasonable to believe

13  the vehicle contains evidence of the offense of arrest.  Gant, 556 U.S. at 351.

14  Petitioner argues that defense counsel rendered ineffective assistance of counsel

15  when he failed to adequately move to suppress the fruits of the car search in this

16  case, namely the baton, which had been discovered during a post-arrest inventory

17  search, and to suppress any observations of the baton.  Petitioner argues that if

18  defense counsel had moved to suppress the fruits of the inventory search, the

19  suppression motion would have been successful and Count Two would have been

20  dismissed.  Petitioner further argues that there could no strategic motion to not move

21  to suppress the fruits of the inventory search.  The trial court rejected this claim,

22  stating, "There was no showing that trial counsel was ineffective in not bringing a

23  renewed suppression motion."  (Docket No. 8, Ex. 7 at 2.)

24          A claim of ineffective assistance of counsel is cognizable as a claim of denial

25  of the Sixth Amendment right to counsel, which guarantees not only assistance, but

26  effective assistance of counsel.  Strickland v. Washington, 466 U.S. 668, 686 (1984).

27  The benchmark for judging any claim of ineffectiveness must be whether counsel's

28  conduct so undermined the proper functioning of the adversarial process that the

United States District Court

For the Northern District of California

1   trial cannot be relied upon as having produced a just result.  Id.  The right to

2   effective assistance counsel applies to the performance of both retained and

3   appointed counsel without distinction.  See Cuyler v. Sullivan, 446 U.S. 335,

4   344–45 (1980).

5        In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, a

6   petitioner must establish two things.  First, he must establish that counsel's

7   performance was deficient, i.e., that it fell below an "objective standard of

8   reasonableness" under prevailing professional norms.  Strickland, 466 U.S. at

9   687–88.  Second, he must establish that he was prejudiced by counsel's deficient

10  performance, i.e., that "there is a reasonable probability that, but for counsel's

11  unprofessional errors, the result of the proceeding would have been different."  Id. at

12  694.  A reasonable probability is a probability sufficient to undermine confidence in

13  the outcome.  Id.

14       The general rule of Strickland, i.e., to review a defense counsel's

15  effectiveness with great deference, gives the state courts greater leeway in

16  reasonably applying that rule, which in turn "translates to a narrower range of

17  decisions that are objectively unreasonable under AEDPA."  Cheney v. Washington,

18  614 F.3d 987, 995 (9th Cir. 2010) (citing Yarborough, 541 U.S. at 664).  When

19  § 2254(d) applies, "the question is not whether counsel's actions were reasonable.

20  The question is whether there is any reasonable argument that counsel satisfied

21  Strickland's deferential standard."  Harrington, 131 S. Ct. at 788.

22       Gant was decided in 2009, after the trial proceedings in the instant case had

23  concluded.  Petitioner does not cite any cases prior to 2008 that would have put trial

24  counsel on notice that a motion to suppress the fruits of a post-arrest inventory

25  search would have been successful.  The reasonableness of counsel's decisions must

26  be measured against the prevailing legal norms at the time counsel represented the

27  defendant.  See, e.g., Bobby v. Van Hook, 558 U.S. 4, 6–9 (2009) (criticizing the

28  appellate court's reliance on the 2003 American Bar Association Standards as

United States District Court

For the Northern District of California

1    commands rather than guidelines when evaluating defense counsel's performance in

2    a 1985 trial); Rompilla v. Beard, 545 U.S. 374, 387 (2005) (citing American Bar

3    Association Standards for Criminal Justice in circulation at time of defendant's

4    trial); Wiggins v. Smith, 539 U.S. 510, 522–23 (2003) (citing American Bar

5    Association professional standards and standard practice in capital defense at

6    pertinent time); see also Jennings v. Woodford, 290 F.3d 1006, 1016 (9th Cir. 2002)

7    (deficient performance where counsel who had settled on alibi defense failed to

8    investigate possible mental defense despite state supreme court decision before trial

9    that in such instances counsel is not excused from investigating the potential mental

10   defense).  At the time of Petitioner's trial, it was clearly established federal law that

11   the impoundment and subsequent inventory search of a vehicle was valid under the

12   Fourth Amendment where the inventory search was pursuant to standardized

13   procedures and there was no showing that police officer was acting in bad faith or

14   for purposes of investigation.  See Colorado v. Bertine, 479 U.S. 367, 374 (1987)

15   ("reasonable police regulations relating to inventory procedures administered in

16   good faith satisfy the Fourth Amendment").  Petitioner argues that Bertine is

17   inapplicable because Respondent has presented no evidence that Petitioner was not

18   in his automobile at the time of the arrest or that the inventory search was conducted

19   according to standardized procedures.  Petitioner is correct that the record is silent as

20   to these two issues.  However, because there is no evidence either way regarding

21   these two issues, it is also equally plausible that defense counsel chose not to raise

22   this issue because Petitioner was not present in his automobile at the time of the

23   arrest and that the inventory search was conducted according to standardized

24   procedures.  The question on federal habeas review is "whether there is any

25   reasonable argument that counsel satisfied Strickland's deferential standard."

26   Harrington, 131 S. Ct. at 788.  Here, there is a reasonable argument that defense

27   counsel believed that Bertine governed inventory searches and that a renewed

28

suppression motion would have been futile.[7]  The state court's denial of this claim

was not contrary to, nor an unreasonable application of, clearly established federal

law.  Accordingly, this claim for federal habeas relief is denied.

**CONCLUSION**

After a careful review of the record and pertinent law, the Court concludes

that the Petition for a Writ of Habeas Corpus must be **DENIED**.

A Certificate of Appealability is **GRANTED** as to whether the trial court's

admission of his statements regarding the baton violated Edwards v. Arizona, 384

U.S. 436 (1995).  However, a Certificate of Appealability is **DENIED** as to

Petitioner's other claims.  See Rule 11(a) of the Rules Governing Section 2254

Cases.  With respect to those claims, Petitioner has not made "a substantial showing

of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  Nor has Petitioner

demonstrated that "reasonable jurists would find the district court's assessment of

the constitutional claims debatable or wrong."  Slack v. McDaniel, 529 U.S. 473,

484 (2000).  Petitioner may not appeal the denial of a Certificate of Appealability in

this Court but may seek a certificate from the Court of Appeals under Rule 22 of the

Federal Rules of Appellate Procedure.  See Rule 11(a) of the Rules Governing

---

[7]If Petitioner had been in the car at the time of the arrest and search, there is a reasonable argument that defense counsel believed that either Chimel v. California, 395 U.S. 752 (1969), or New York v. Belton, 453 U.S. 454 (1981), were applicable to Petitioner's case and that a renewed suppression motion would have been futile. In Chimel, the Supreme Court held that a police officer who makes a lawful arrest may conduct a warrantless search of the arrestee's person and the area "within his immediate control."  Chimel, 395 U.S. at 763, abrogation recognized by Davis v. U.S., 131 S. Ct. 2419, 2424 (2011).  In Belton, the Supreme Court held that  the Court announced "that when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile."  Belton, 453 U.S. 459–60 abrogation recognized by Davis v. U.S., 131 S. Ct. 2419, 2424 (2011).  In 2011, after the trial court proceedings in this instant case, the Supreme Court noted that Arizona v. Gant, had modified the rulings in Chimel and Belton, and "adopted a new, two-part rule under which an automobile search incident to a recent occupant's arrest is constitutional (1) if the arrestee is within reaching distance of the vehicle during the search, or (2) if the police have reason to believe that the vehicle contains 'evidence relevant to the crime of arrest.'"  Davis, 131 S. Ct. at 2425 (citing Gant, 556 U.S. at 343) (declining to retroactively apply Gant to a search that took place two years before Gant was decided).

United States District Court
For the Northern District of California

1   Section 2254 Cases.

2       The Clerk shall terminate any pending motions, enter judgment in favor of

3   Respondent, and close the file.

4       IT IS SO ORDERED.

5   DATED: _____7/10/2015_____

6                                    EDWARD J. DAVILA
                                     United States District Judge